OKLAHOMANS FOR LIFE, INC., an Oklahoma corporation, Appellant,

v.

The STATE FAIR OF OKLAHOMA, INC., an Oklahoma corporation, Appellee.

No. 53267.

Supreme Court of Oklahoma.

July 28, 1981.

Rehearing Denied Oct. 13, 1981.

Lampkin, Wolfe, McCaffrey & Tawwater, Ben T. Lampkin, Oklahoma City, for appellant.

McAffee & Taft, Robert H. Gilliland, Jr., Joseph H. Bocock, Oklahoma City, for appellee.

OPALA, Justice.

Two issues are presented: [1] Was the summary action appealable as a final judgment? and if so, [2] Did the trial court err in rendering summary judgment against the plaintiff?

We hold that (a) the decision sought to be reviewed is properly before us as the trial court's final disposition of an entire cause of action and (b) summary judgment was proper because (1) the allegedly harmful conduct did not constitute state action which, either explicitly or implicitly, violated plaintiff's federal or state constitutional rights; and (2) the plaintiff did not state a private right of action which may be implied in its favor from some statutory or constitutional norms.

Three corporate entities are parties to this suit—the plaintiff, Oklahomans for Life, Inc. [Life] and two defendants, The State Fair of Oklahoma, Inc. [Fair] and Planned Parenthood Association [Association].

Life rented booth space from Fair for the 1977 Oklahoma County "state fair". The agreement reserved in Fair the right to remove any material "deemed unsuitable or objectionable ... without assigning a reason therefor". During the first week of the fair, Life began distributing anti-abortion literature which Fair deemed objectionable and outside the contractually agreed purpose for which the booth space was let—i.e. "an educational exhibit explaining biological life in the womb". A Fair official re-

moved all the literature and displays from the booth and declined to return them before the fair closed. Fair then refused to rent exhibit space to Life for the 1978 exposition. Life brought this action (1) against Fair and Association for damages occasioned by the conspiracy between these two entities to deprive Life of civil rights and (2) against Fair for conversion and breach of lease agreement. Fair's motion for summary judgment was granted as to the first cause of action but denied as to the second. The Court of Appeals dismissed Life's appeal. We granted certiorari.

## I.

### DISMISSAL OF APPEAL

■ The Court of Appeals dismissed this appeal believing it to be one prosecuted from the trial court's partial summary adjudication—an unappealable interlocutory order under *Reams v. Tulsa Cable Television, Inc.*[1] We find *Reams* inapplicable here.

The petition declares in the first cause of action a claim against both Association and Fair. The second claim, on the other hand, is *solely* against Fair. In the first claim Life seeks damages for its loss of civil rights as a result of a conspiracy between the two defendants. The second claim is for conversion and breach of a lease agreement. The trial court's disposition of the first claim had the effect of letting out of the case the co-defendant, Association, against whom there was *no* other claim. Life's failure timely to appeal from the decision would hence have resulted in a *final* judgment in favor of Association.[2]

There is another reason for holding that the decision under review was a final judgment. The Court of Appeals was incorrect in viewing the two causes of action as but three alternative theories of recovery or different elements of damage occasioned by a single wrong or occurrence. Rather, the two claims must be regarded as distinct causes of action. This is so because they are based on separate transactions or wrongs.[3] The first rests on a damage-dealing *act of conspiracy* to deprive the plaintiff of its civil rights, while the second is anchored on the tort of *conversion* as well as on the *breach of a lease agreement.*

A trial court's decision, which determines all of the issues in one entire cause of action among several stated in a suit, constitutes a final appealable disposition.[4]

## II.

### THE PRECLUSIVE EFFECT OF PRIOR FEDERAL DISMISSAL

■ Life seeks here to relitigate the issue whether Fair's allegedly offending conduct in depriving Life of its First Amendment guarantees of free speech constituted state action. That question had been previously adjudicated in another suit which was dismissed by a federal court. The order of dismissal, now final, recites that Fair officials, in their conduct of the 1977 fair, neither acted "under color of any state law" nor unlawfully deprived Life "of any right, privilege or immunity secured by the Constitution of the United States or by any act of Congress".[5]

Fair urges that collateral estoppel—also known as the doctrine of preclusion—operates to bar Life from tendering "state action" as a disputed issue fit for relitigation in the present suit. That issue is, of course, a necessary component of the instant action for bringing about Life's loss of its First Amendment right of free speech.[6]

---

1. Okl., 604 P.2d 373, 376 [1979].

2. *Ritter v. Perma-Stone Co.*, Okl., 325 P.2d 442, 443 [1958].

3. *Retherford v. Halliburton Company*, Okl., 572 P.2d 966, 968–969 [1978].

4. *Cox v. Butts*, 48 Okl. 147, 149 P. 1090, 1091 [1915]; *LaVelle v. Fair Oil Co.*, Okl., 388 P.2d 13, 17 [1963].

5. *Oklahomans for Life, Inc. v. Dean A. McGee, John R. Parsons et al.*, No. CIV–77–1175–C [W.D.Okl. 1978].

6. *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196, 202 [1976].

The term "preclusion" had its antecedents in the academic analysis of Prof. Allen D. Vestal.[7] It is becoming an acceptable legal term.[8] Its application requires that there exist an identity of parties and subject-matter.[9] When invoked, the doctrine calls for a determination that the tendered issue was adjudicated in some prior case in which it was essential to its outcome.[10]

We find the identity-of-the-parties requirement met both as to Life and Fair, although Fair, when litigating the earlier (federal) case, may have had a somewhat different complement of officers from those who were on its board at the time the instant (state) action was filed.

Life is precluded from relitigating the state-action issue with respect to all of its federal constitutional claims against Fair. That controversy, which embraces the alleged invasion of interests protected by the First Amendment, stands determined by the prior dismissal of the federal-court action.[11] What survives of Life's constitutional claims is the alleged violation by Fair of Life's rights under Art. II § 22 of the state constitution.[12]

**7.** See A. Vestal, Res Judicata/Preclusion, Personal Injury Annual [1969]; Vestal, Res Judicata/Preclusion: Expansion, 47 S.Cal.L.Rev. 357 [1974]; Vestal, State Court Judgment as Preclusive in Section 1983 Litigation in a federal court, 27 Okla.L.Rev. 185, 202 [1974].

**8.** *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 [1980].

**9.** *Laws v. Fisher,* Okl., 513 P.2d 876, 877 [1973].

**10.** *Anco Mfg. and Supply Co., Inc. v. Swank,* Okl., 524 P.2d 7, 12–13 [1974].

**11.** *Seguros Tepeyac, S.A., Company Mexicana v. Jernigan,* 410 F.2d 718, 726 [5th Cir. 1969]; *Ham v. Holy Rosary Hospital,* 165 Mont. 369, 529 P.2d 361, 365–366 [1974].

**12.** The terms of Art. II § 22 provide in pertinent part: "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and *no law shall be passed* to restrain or abridge the liberty of speech or of the press. * * *" [emphasis ours].

## III.

## FAIR AS PUBLIC OR PRIVATE ENTITY AND ITS RELATIONSHIP TO THE STATE AND TO THE CITY

■■ The answer to the question whether Fair's allegedly offending conduct constituted "state action" turns on the precise nature of its relationship to the state and to the city in the factual context of this case. We find no guidance in the authorities cited by Life.

Fair is an incorporated non-profit organization. The City of Oklahoma City owns the fairgrounds which are under a written lease to Fair. Neither the state nor the city provides funds to Fair. *No* governmental entity plays a policy-making role in the conduct of Fair's activities. State or city involvement, direct or oblique, is totally absent from the challenged conduct of Fair.

Neither can it be said that a *"symbiotic" relationship* existed between the state or city and Fair[13] so as to make either a partner or joint venturer in Fair's operations. No partnership status of any sort can be ascribed or imputed to the leasing arrangements in suit.

**13.** The "symbiotic relationship" test, announced in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 [1961]—a racial discrimination case against a privately-owned restaurant operated in a publicly-owned and state-subsidized parking garage—announces that when the State has not clearly directed the act of discrimination by private enterprise, which has a "symbiotic" relationship with it, state action is nonetheless present. There the Court held that the state had so injected itself into a position of interdependence with the restaurant in suit that it must be recognized as a joint participant in the challenged activity. The same test was explored again in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 [1972] where, despite the presence of pervasive private club regulation by the state liquor control board, the taint of *Burton's* symbiotic relationship was rejected. This is so because the Moose Lodge was a private social club operating in a private building. Liquor regulation could not be said to make the state, in any realistic sense, a partner or even joint venturer in the club's enterprise.

Although a symbiotic relationship does not exist here, there may still be present a sufficiently *close nexus* between the state and the challenged act to warrant a finding of state action.[14] The state must affirmatively support, and be directly involved in, the challenged acts before state action can be found. The terms of the lease agreement authorizing removal of objectionable material were not shown to have been subject to approval by either the state or city. Neither does it appear that either the state or city was consulted or their approval sought before Fair removed the materials. We find that the conduct challenged by Life does not provide a sufficiently *close nexus* between the state or city and the actions of Fair so as to fairly allow them to be treated as those of the state itself.

Fair is a non-public entity and its linkage with the state and city is not sufficient to transmute its private conduct—under consideration here—into state or city action.[15]

## IV.

## MAY A PRIVATE CAUSE OF ACTION FOR RECOVERY OF DAMAGES BE IMPLIED FROM OKLAHOMA'S CONSTITUTIONAL FREE–SPEECH PROTECTION OR FROM STATE STATUTES?

■ Because Life is barred by preclusion from pressing against Fair its First Amendment claim and since we have determined here that Fair's alleged misconduct does not constitute state action, it is unnecessary for us to reach for answer the issue whether Fair's contractually-exacted power to curb Life's freedom to disseminate material at the fairgrounds was a permissible "time, place and manner" restriction on Life's exercise of protected First Amendment rights. See *Heffron v. International Society for Krishna Consciousness, Inc.*[16]

Were we willing to extend Oklahoma's free-speech protection beyond its federal contours by espousing the California doctrine of *Robins v. Pruneyard Shopping Cen-*

14. In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 [1974] a new test was discussed. *Jackson* involved a heavily-regulated but privately-owned utility company which discontinued service to a customer, without a hearing, after she failed to pay her utility bills. The Court held that the inquiry to be addressed must be whether there is a sufficiently *close nexus* between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. *No* state action was found.

In *Fulton v. Hecht*, 545 F.2d 540 [5th Cir.] cert. den. 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 [1977]—where a private kennel club refused to renew a booking contract of a dog racer who sued under 42 U.S.C. § 1983—the court analogized the dog racing industry to the public utility situation in *Jackson*, supra, holding that despite extensive state regulation, sharing of revenues and state audit of racetrack books, the state was not, in any realistic sense, a partner in the endeavors of the club.

In *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 597 [3rd Cir. 1979] the operators of a racetrack cancelled the stall privileges of a trainer, thus effectively precluding him from racing at the track. The court rejected the claim of state action under the *Burton* symbiotic-relationship test because it found the relationship was not one that made the state a joint venturer with the owners. Pursuing the *Jack-* son test and analyzing the challenged act to determine the nature and extent of the state's involvement in the expulsion of the trainer, the court held there was a sufficiently *close nexus* between the state and the acts of the owners so that the expulsion of the trainer may be fairly treated as that of the state itself. The court in *Fitzgerald* viewed the key issue under the *Jackson* test to be whether the state participated in the offending conduct by "putting its weight" behind the challenged activity. It is the intimate involvement by the state in the private act which provides sufficient *nexus* between the state and private activity to warrant a finding of state action.

15. Although in interpreting the scope of the free-speech clause of our state constitution, we are not bound by federal decisions as to state-action requirements under the Fifth or Fourteenth Amendments of the federal constitution, we find no tenable ground for not following the guidelines of *Burton v. Wilmington Parking Authority*, supra note 12, and *Jackson v. Metropolitan Edison Co.*, supra note 13. See also *Garfinkle v. Superior Court of Contra Costa County*, 21 Cal.3d 268, 146 Cal.Rptr. 208, 578 P.2d 925, 934 [Cal. 1978]; *Beck v. Bacone College*, Okl.App., 604 P.2d 876, 877–878 [1980].

16. —— U.S. ——, 101 S.Ct. 2559, 69 L.Ed.2d 298 [1981].

*ter* [17]—an approach found by the United States Supreme Court not to violate the fundamental law of the Federal Republic [18] —Life would not benefit from the largesse because (a) it has agreed by private contract to the dissemination restrictions and (b) it asserts here no ground for relief from that obligation on some principle recognized by contract law. Life has advanced *no* theory suggesting some legal infirmity in its contractual arrangements with Fair. A California-style extension of Oklahoma's free-speech protection in Art. II § 22 would offer no escape hatch for Life. *Pruneyard* provides *no* avenue of relief from voluntary private-contract restrictions on one's freedom of expression. In this posture of the case we are not called upon either to adopt or reject the *Pruneyard* expansion of the First Amendment.

■ What remains for our consideration is to comment on the validity of the contractual restrictions placed upon Life's freedom to disseminate material at the fairgrounds. Life's petition is devoid of any plea for relief from these provisions *via* rescission or through some other theory of avoidance. In short, so far as the record shows, Life is utterly without any basis for refusing to treat the restrictive terms of its bargain—by which it must remain bound— as valid and subsisting and hence no private claim can be implied in its favor.[19]

Fair's conduct reveals no tortious invasion of, or interference with, Life's protected interest in free expression under the state law.

The opinion of the Court of Appeals is accordingly vacated, the appeal stands reinstated and the trial court's judgment is affirmed.

All Justices concur.

---

**17.** 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 [Cal. 1979]. In *Pruneyard* the California Supreme Court held that the state constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." 592 P.2d at 347.

**18.** *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 [1981]. In *Pruneyard,* the U.S. Supreme Court upheld the power of the California Supreme Court to construe its state's constitutional protection of free expression in a manner broader than the federal parameters of the First Amendment values. The California court, basing its decision on that state's free-expression clause, mandated the private owner of a shopping center— open to the public—not to interfere with the public's free expression and petition rights.

**19.** We note a moderate trend in federal-court decisions to imply private rights of action from statutes and constitutional provisions which do not explicitly create them. The opportunity for asserting this right has been defined—and somewhat curtailed—in recent cases. *California v. Sierra Club,* —— U.S. ——, 101 S.Ct. 1775, 68 L.Ed.2d 101 [1981]. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 [1975] fashions a four-part test, with criteria for determining whether a private cause of action should be implied from a *federal statute.* A new—and different—standard for private rights of action, which may be implied from *federal constitutional* norms, has been articulated in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 [1979]. See annotation on Implication of Private Right of Action from Provision of United States Constitution— Federal Cases, 64 L.Ed.2d 872 et seq.